UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

KEVIN BRYANT,
              Plaintiff,

-against-

DEPARTMENT OF CORRECTIONS
AND COMMUNITY SUPERVISION
("DOCCS"), ACTING COMMISSIONER
ANTHONY ANNUCCI, in his official capacity,
CHIEF MEDICAL OFFICER CARL
KOENIGSMANN, in his official capacity,
DEBRA STUBEUSZ, M.D., in her official
capacity.

              Defendants.

CIVIL CASE NO.

**AMENDED COMPLAINT**

## PRELIMINARY STATEMENT

1. Kevin Bryant, an individual with multiple disabilities, was transferred from the Wende Regional Medical Unit ("RMU") where he was receiving necessary medical care and support to general population at Five Points Correctional Facility ("Five Points") in retaliation for exercising his legal rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C § 12203 et seq. and Section 504 of the Rehabilitation Act of 1973 ("Section 504").

2. Mr. Bryant's retaliatory transfer also deprived him of his rights under the First and Eighth Amendments of the Constitution of the United States in violation of 42 U.S.C. § 1983.

3. Mr. Bryant was transferred after he sought a reasonable accommodation to access the law library for himself and assisted other individuals with disabilities with seeking the same accommodation.

## JURISDICTION

4. This court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331.

5. Venue is properly brought pursuant to 28 U.S.C. §§ 1391(b)(2), as a substantial part of the events or omissions giving rise to this claim occurred in this judicial district.

## PARTIES

6. Plaintiff Kevin Bryant is a fifty-nine years old inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS").

7. DOCCS is responsible for the operation of correctional facilities in New York State.

8. Defendant Anthony J. Annucci is the Acting Commissioner of DOCCS.

9. Mr. Annucci is responsible for the care, custody, and control of all inmates housed in DOCCS facilities.

10. As the Acting Commissioner, Mr. Annucci has "the superintendence, management and control of the correctional facilities in the department and of the inmates confined therein, and of all matters relating to the government, discipline, policing, contracts and fiscal concerns thereof. He…shall have the power and it shall be his…duty to inquire into all matters connected with said correctional facilities." (N.Y. Correct. Law § 112).

11. Mr. Annucci is sued in his official capacity, for prospective injunctive and declaratory relief, for his failure to prevent Mr. Bryant's retaliatory transfer.

12. Chief Medical Officer Koenigsmann is responsible for the overall medical care provided to inmates in the custody of DOCCS.

13. Chief Medical Officer Koenigsmann is sued in his official capacity, for prospective injunctive and declaratory relief, for his failure to prevent Mr. Bryant's retaliatory transfer.

14. Defendant Debra Stubeusz, M.D., is a medical doctor licensed by the State of New York and is an Employee of Defendant DOCCS.

15. Dr. Stubeusz was responsible for writing Mr. Bryant's discharge summary and determining he was medically cleared and could be discharged from the RMU to general population.

16. Dr. Stubeuz was responsible for medically clearing Mr. Bryant for discharge from the RMU despite making no clinical findings that he had experienced medical improvement and could safely live in general population.

~~13.~~17. Dr. Stubeusz is sued in her official capacity for prospective injunctive and declaratory relief for facilitating Mr. Bryant's transfer.

## FACTS

~~14.~~18. Kevin Bryant has been incarcerated since 2004.

~~15.~~19. Mr. Bryant is an individual with multiple disabilities, including a seizure disorder, left side hemiparesis, and congenital heart disease.

~~16.~~20. He must wear a helmet for the majority of his waking hours in order to reduce the risk of head trauma.

~~17.~~21. On April 7, 2005, Mr. Bryant was transferred to the Wende RMU.

~~18.~~22. At Wende RMU, Mr. Bryant received necessary supports and medical treatment to address and monitor his multiple disabilities.

~~19.~~23.  Immediately prior to his transfer to the Wende RMU, Mr. Bryant had been at Strong Memorial Hospital.

~~20.~~24.  Two days after arriving at Wende RMU, on April 9, 2005, Mr. Bryant had a generalized seizure.

~~21.~~25.  Mr. Bryant was admitted to Erie County Medical Center.

~~22.~~26.  Mr. Bryant has continued to intermittently experience seizures since April 9, 2005.

~~23.~~27.  Mr. Bryant regularly experiences one to two small seizures per week.

~~24.~~28.  When Mr. Bryant experiences a seizure, his left hand shakes and his head shakes.

~~25.~~29.  Mr. Bryant is at risk of falling and injuring himself when having a seizure.

### SEEKING PHYSICAL ACCESS TO THE LAW LIBRARY

~~26.~~30.  Mr. Bryant first communicated with Disability Rights New York ("DRNY") on August 11, 2015.

~~27.~~31.  Mr. Bryant told DRNY that inmates in the Wende RMU do not have physical access to the law library.

~~28.~~32.  Inmates who cannot physically access the law library are disadvantaged in performing their legal research.

~~29.~~33.  DRNY sent Mr. Bryant a survey regarding his experience with legal research at Wende's RMU.

~~30.~~34.  On April 17, 2017, DRNY contacted DOCCS' legal counsel and told counsel that DRNY would be visiting Wende's RMU to hand out surveys.

~~31.~~35.  A copy of the survey was attached to the email to DOCCS' legal counsel.

32.36.  The survey contained questions about inmates' experiences attempting to conduct legal research and accessing the law library.

33.37.  DRNY requested that DRNY attorneys be permitted to distribute the surveys during their visit.

34.38.  DRNY's request to distribute surveys was subsequently denied by Wende's Superintendent Stewart Eckert.

35.39.  On August 28, 2016, Mr. Bryant requested that DRNY send him more copies of the survey because he had spoken to other inmates regarding access to the law library and they were interested in speaking to DRNY.

36.40.  DRNY sent copies of the survey to Mr. Bryant.

37.41.  DRNY received 13 surveys filled out by inmates in Wende's RMU.

38.42.  Mr. Bryant requested access to the law library as a reasonable accommodation on September 29, 2016, October 20, 2016, and November 17, 2016.

39.43.  On November 4, 2016, DOCCS adopted a new policy, which permitted RMU inmates to request physical access to the law library.

40.44.  On November 20, 2016, Mr. Bryant requested physical access to the law library using DOCCS "Request for Reasonable Accommodation" form.

41.45.  On November 23, 2016, Mr. Bryant's November 17, 2016 request was denied "as per medical and functional limitations."

42.46.  On November 28, 2016, Mr. Bryant's November 20, 2016, request for physical access to the law library was denied.

43.47.  On November 29, 2016, Mr. Bryant informed DOCCS that he disagreed with the determination in writing on the 'Request for Reasonable Accommodation" form.

44.48.  On December 22, 2016, Nancy Heywood, Defendant DOCCS' deputy counsel, wrote that Mr. Bryant could not go to the law library because:

> "Inmate has multiple serious medical problems. He has a Left hemiparesis requiring cane use for short distance ambulation and wheelchair use for longer distance mobility. He has congenital heart disease with atrial fibrillation and requires an anticoagulation. He has had multiple serious bleeds, secondary to his anti-coagulation into his retroperitoneum, Lt psoas muscle and most recently a bleed with minimal trauma into his right forearm- which developed into a compartment syndrome needing emergency evacuation. This procedure left his forearm with a 6cmx6cm open wound which took 7 months of treatment in the Wound Clinic at ECMC and daily meticulous nursing care to heal. He also has a seizure disorder. He is treated with anti-epileptic medications; however, he still has 1-2 seizures per year which have occurred while he attended activities, such as religious services in the RMU, requiring nursing staff to emergently attend to his medical needs. He has to wear a helmet outside of his room to protect his head from trauma during a seizure, due to his need for an anticoagulation. Trauma to his head, even with the helmet, could result in a disastrous bleed into his brain with horrible consequences to his already impaired functional status. Attending a program outside the RMU, puts this inmate at significant risk, given that lack of nursing/medical staff. Sending medical/nursing staff with the inmate to the law library or other program would render them unable to perform other duties and would create a staffing shortage in the RMU for the hours that they are away. This places an undue burden on the Department."

45.49.  Prior to December 22, 2016, Mr. Bryant had attended religious services in Wende's general population without incident.

46.50.  DRNY asked DOCCS why Mr. Bryant could not travel to the law library when he was already traveling to religious services held in general population.

47.51.  On January 31, 2017, Ms. Heywood denied that Mr. Bryant was going to religious services in general population.

48.52.  Ms. Heywood later recanted the statement made in paragraph 44 and said that RMU staff had not been aware Mr. Bryant was traveling to religious services.

49.53. On April 7, 2017, Mr. Bryant was approved to go to the law library.

50.54. After April 7, 2017, Mr. Bryant began assisting other inmates in the RMU to get access to the law library

51.55. Mr. Bryant assisted other RMU inmates in organizing their legal documents, retaining counsel, and following-up with counsel at appropriate times.

52.56. Mr. Bryant referred other RMU inmates to case law that he believed would be helpful in their appeals.

### WENDE CORRECTIONAL FACILITY REGIONAL MEDICAL UNIT CARE

53.57. The RMU is a separate unit from the general population.

54.58. The RMU houses inmates with serious medical conditions who require consistent access to medical professionals.

55.59. The RMU has a registered nurse working on each floor 24 hours a day, 7 days a week.

56.60. The Wende RMU has two licensed professional nurses working on each floor 24 hours a day, 7 days a week.

57.61. The RMU has additional licensed professional nurses specifically assigned to medication distribution.

58.62. The Wende RMU inmates are evaluated by a licensed physician at least every two weeks.

59.63. Physicians who work in the Wende RMU are assigned to a specific floor and are familiar with each RMU inmates' medical needs and history.

60.64. Physicians who work in the Wende RMU are assisted by a physician's assistant.

~~61.~~65.  While housed in the Wende RMU, Mr. Bryant's vitals, temperature, and blood pressure were monitored every morning at approximately 7:00 a.m.

~~62.~~66.  While housed in the Wende RMU, if Mr. Bryant was experiencing an exacerbation of any of his medical conditions, his vitals, temperature and blood pressure would be checked again at lunch time.

~~63.~~67.  While housed in the Wende RMU, Mr. Bryant's vitals, temperature and blood pressure were also checked daily at 3:00 p.m. and 7:00 p.m.

~~64.~~68.  While housed in the Wende RMU, Mr. Bryant had his blood drawn and tested every one to two weeks.

~~65.~~69.  Mr. Bryant regularly experiences 1 to 2 small seizures per week.

~~66.~~70.  When Mr. Bryant experiences a seizure, his left hand shakes and his head shakes.

~~67.~~71.  If Mr. Bryant is seated while he experiences a seizure, he is unlikely to injure himself.

~~68.~~72.  If Mr. Bryant is standing while he experiences a seizure, he is at risk of falling and hitting his head or other body parts which could lead to severe injury or death.

~~69.~~73.  Each cell in the Wende RMU has at least one working intercom call button that connects Wende RMU inmates with the Wende RMU nursing staff, and vice versa.

~~70.~~74.  If Mr. Bryant experienced a seizure while housed at the Wende RMU, his roommate would immediately use the cell call button to contact the medical staff.

~~71.~~75.  Mr. Bryant would then have his vitals taken by a nurse.

~~72.~~76.  Mr. Bryant's most recent Wende RMU Health Provider Order Sheet ("Order Sheet"), dated June 23, 2017, describes his current medical needs.

73.77.  Mr. Bryant's Order Sheet states that his vitals are to be taken each morning and evening with apical pulse check, pulse oximetry check, and temperature taken.

74.78.  Mr. Bryant's Order Sheet states that elevated or unusual vitals require attention by a nurse practitioner or physician.

75.79.  Mr. Bryant's Order Sheet states that a complete blood count test and a blood differential test must be conducted monthly.

76.80.  Mr. Bryant's Order Sheet states that a comprehensive metabolic panel, digoxin level, magnesium level and Keppra trough level must be checked every 3 months.

77.81.  Mr. Bryant's Order Sheet states that a fasting lipid profile must be run every 6 months.

78.82.  Mr. Bryant's Order Sheet mandates a quarterly physical therapy evaluation.

### FIVE POINTS CORRECTIONAL FACILITY GENERAL POPULATION

79.83.  On July 7, 2017, Mr. Bryant was transferred out of the Wende RMU to general population at Five Points.

80.84.  As of the filing of this lawsuit, Mr. Bryant is housed in general population at Five Points.

81.85.  Mr. Bryant's medical conditions did not improve prior to this transfer.

82.86.  Five Points can house a maximum of 1,500 inmates.

83.87.  A single physician is assigned to care for all of the inmates at Five Points.

84.88.  Five Points staffs three physician's assistants for the care of the entire inmate population.

85.89.  Mr. Bryant's cellmate is classified as a "cell assistant."

86.90.  A "cell assistant" is supposed to clean the cell, and assist his disabled cellmate with simple daily tasks.

87.91.  Mr. Bryant's "cell assistant" cellmate is also tasked with pushing Mr. Bryant in his wheelchair when Mr. Bryant needs to travel long distances within Five Points.

88.92.  Mr. Bryant's "cell assistant" did not provide reliable assistance to Mr. Bryant when he first arrived at Five Points.

89.93.  If Mr. Bryant's "cell assistant" is not available to push Mr. Bryant, he must notify a correction officer who will then attempt to locate a "mobility assistant" to assist Mr. Bryant.

90.94.  A "mobility assistant" is an inmate tasked with assisting inmates who use wheelchairs in navigating correctional facilities.

91.95.  Upon his arrival at Five Points, Mr. Bryant had frequent difficulties accessing "mobility assistants."

92.96.  Mr. Bryant could not access areas of the facility that he was permitted to access because he was unable to travel to them independently.

93.97.  If Mr. Bryant is in need of non-emergency medical attention at Five Points, he must go to "sick call."

94.98.  "Sick call" is the method by which appointments with medical staff are scheduled.

95.99.  "Sick call" is available at Five Points at 5:30 a.m. on Monday, Tuesday, Thursday and Friday only.

96.100.   Appointments with medical staff, including physicians, physician's assistance and nurse practitioners are scheduled through "sick call" only.

~~97.~~101.    To go to "sick call," Mr. Bryant must fill out a sick-slip by approximately 10:00 p.m. indicating his desire to see a medical professional at "sick call" the next day.

~~98.~~102.    If Mr. Bryant's sick-slip is collected by a corrections officer, he will be taken to "sick call" on the next scheduled "sick call" day.

~~99.~~103.    If Mr. Bryant experiences a medical issue late in the evening, he may miss collection of sick-slips and will not be permitted to see a nurse at the next "sick call."

~~100.~~104.    If Mr. Bryant experiences a medical emergency, he must first notify his unit officer.

~~101.~~105.    The unit officer has the discretion to decide whether Mr. Bryant will be taken to emergency "sick call"

~~102.~~106.    At emergency "sick call," Mr. Bryant would likely be evaluated by a licensed practical nurse in the infirmary at Five Points.

~~103.~~107.    The licensed practical nurse decides if further medical attention for Mr. Bryant was necessary.

~~104.~~108.    When Mr. Bryant is experiencing a seizure, he cannot directly alert a medical professional, he must first notify a corrections officer.

**MEDICAL INCIDENTS SINCE TRANSFER TO FIVE POINTS CORRECTIONAL FACILITY**

~~105.~~109.    When Mr. Bryant needs to see a nurse or medical professional following a seizure event, he must follow the emergency sick-call procedures as described above.

~~106.~~110.    After his transfer to Five Points, Mr. Bryant banged his leg on his bed frame and developed a severe bruise and swelling.

~~107.~~111.    Mr. Bryant reported his bruising to the Five Points medical staff at "sick call" after he was injured.

~~108.~~112.	Mr. Bryant was not seen by a physician until approximately a week after he reported the injury.

~~109.~~113.	In the past, Mr. Bryant has had multiple incidents where a small injury such as a bruise quickly developed into a severe infection.

~~110.~~114.	Shortly after his transfer to Five Points, Mr. Bryant met with physician's assistant David Haimes.

~~111.~~115.	Mr. Bryant asked Mr. Haimes if he was familiar with Mr. Bryant's complicated medical history and many medical needs.

~~112.~~116.	Mr. Haimes stated that because there are so many inmates housed at Five Points, it is impossible for the medical staff to be familiar with each inmate's history.

~~113.~~117.	Shortly after his transfer on July 7, 2017, Mr. Bryant requested to be seen by a physician.

~~114.~~118.	Mr. Bryant was not seen by a physician following his request for about two weeks.

~~115.~~119.	Mr. Bryant has been seen by the physician assigned to Five Points, Doctor Nidello, twice since his transfer.

~~116.~~120.	On September 28, 2017, Mr. Haimes noted in Mr. Bryant's medical records that Five Points "may not be the appropriate facility for him."

~~117.~~121.	On or about October 1, 2017, Mr. Bryant began a new anti-seizure medication.

~~118.~~122.	Prior to changing medications, Mr. Bryant had been taking the same anti-seizure medication for approximately 12 years.

119.123.    Five Points medical staff did not inform Mr. Bryant that the new anti-seizure medication's side effects could be severe.

120.124.    On October 7, 2017, Mr. Bryant stood up in his cell, and his leg gave out underneath him.

121.125.    Mr. Bryant fell onto the rail of his bed and experienced severe pain in the side of his chest and abdomen.

122.126.    Mr. Bryant notified corrections officers that he had fallen.

123.127.    Despite having notified the corrections officers, Mr. Bryant was not provided with any medical attention after this fall.

124.128.    On October 8, 2017, Mr. Bryant fell again when attempting to stand.

125.129.    Mr. Bryant reported severe pain to the corrections officers, who then took him to the infirmary at Five Points.

126.130.    Mr. Bryant was transferred to Cayuga Medical Center in Ithaca, NY, where it was discovered that he had broken 3 ribs as a result of one of his falls.

127.131.    Mr. Bryant remained at Cayuga Medical Center for approximately one week.

128.132.    While at Cayuga Medical Center, Mr. Bryant underwent a CT scan and extensive bloodwork.

129.133.    Mr. Bryant also received 2 to 3 pints of blood due to his low blood volume while at Cayuga Medical Center.

130.134.    Mr. Bryant has since returned to the anti-seizure medication he was taking while housed at the Wende RMU.

~~131.~~135.     At the beginning of December 2017, routine blood work showed that Mr. Bryant might have internal bleeding.

~~132.~~136.     DOCCS transferred Mr. Bryant to Upstate Medical Center in Syracuse, NY.

~~133.~~137.     Upstate Medical Center diagnosed Mr. Bryant with an ulcer in his small intestine.

~~134.~~138.     Mr. Bryant's dose of blood thinning medication was reduced and he was provided antacids.

~~135.~~139.     Immediately following his stay at Upstate Medical Center, Mr. Bryant began to experience severe migraines for a period of 3-4 days.

~~136.~~140.     Mr. Bryant was subsequently diagnosed with a small hematoma in his brain.

~~137.~~141.     In the early morning hours of February 1, 2018, Mr. Bryant believed that he was experiencing a ~~seizure~~stroke.

~~138.~~142.     Mr. Bryant told his "cell assistant" that he believed he was having a ~~seizure~~stroke, and the "cell assistant" yelled for a corrections officer to come to Mr. Bryant's assistance.

~~139.~~143.     The corrections officer decided that it was appropriate for Mr. Bryant to be taken to emergency "sick call."

~~140.~~144.     There was an approximately 30 minute delay between when Mr. Bryant's "cell assistant" notified a corrections officer of the medical emergency, and Mr. Bryant being transported to emergency "sick call."

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

~~141.~~145.	On July 7, 2017, Mr. Bryant was transferred out of the Wende RMU into general population at Five Points.

~~142.~~146.	On July 14, 2017, DRNY learned of Mr. Bryant's transfer.

~~143.~~147.	On July 20, 2017, DRNY wrote to DOCCS demanding that Mr. Bryant be returned to an RMU.

~~144.~~148.	DOCCS failed to respond.

~~145.~~149.	On August 6, 2017, Mr. Bryant filed a grievance regarding his transfer from Wende to Five Points pursuant to Prison Litigation Reform Act. 42 U.S.C. §1997(e).

~~146.~~150.	In his grievance, Mr. Bryant stated that he was transferred in retaliation for his advocacy of law library access for Wende RMU inmates.

~~147.~~151.	Mr. Bryant also stated that he had reported seizures and injuries to the facility, and had received inadequate or no medical care.

~~148.~~152.	Mr. Bryant stated that his specific medical needs could not be met in general population, and requested a transfer to an RMU.

~~149.~~153.	On August 24, 2017, Mr. Bryant's grievance was denied.

~~150.~~154.	On August 30, 2017, Mr. Bryant appealed the decision to the Superintendent.

~~151.~~155.	On September 12, 2017, Mr. Bryant's appeal was denied.

~~152.~~156.	On September 20, 2017, Mr. Bryant filed an appeal statement to the Central Office Review Committee ("CORC").

~~153.~~157.	At the date of filing, Mr. Bryant has not received a response from the CORC.

~~154.~~158.    DOCCS Directive 4040 states that the CORC should "direct parties…within 30 calendar days from when the appeal was received."

~~155.~~159.    As required, Mr. Bryant has exhausted his administrative remedies.

~~156.~~160.    Mr. Bryant remains in general population, leaving his health and safety in peril.

## CLAIMS FOR RELIEF

### First Claim for Relief -42 U.S.C. § 1983 – First Amendment

~~157.~~161.    Mr. Bryant re-alleges and incorporates herein all previously alleged paragraphs of the Complaint.

~~158.~~162.    The First Amendment to the United States Constitution protects an individual's right to petition the government for redress of grievances.

~~159.~~163.    Mr. Bryant engaged in activity protected under the First Amendment of the United States Constitution when he advocated for equal access to programming for inmates housed in the Wende RMU.

~~160.~~164.    Mr. Bryant engaged in activity protected under the First Amendment of the United State Constitution when he filed a grievance challenging his unequal access to programming as a RMU inmate.

~~161.~~165.    Mr. Bryant engaged in protected activity when he notified others of how to utilize the grievance process to request access to the law library.

~~162.~~166.    Mr. Bryant also distributed surveys from DRNY inquiring about individuals' experiences in attempting to get access to the law library.

~~163.~~167.    As a result of and in retaliation for his advocacy, Mr. Bryant was transferred out of the RMU, where he was receiving medical treatment, to general population

full-time, despite DOCCS's explicit recognition that Mr. Bryant has a risk of harm due to his medical conditions.

~~164.~~168.    Defendants Annucci and Koenigsmann have violated and continue to violate the First Amendment rights of Mr. Bryant.

~~165.~~169.    Defendants Annucci and Koenigsmann, as New York State employees, were acting under the color of state law when they violated Mr. Bryant's First Amendment rights and continue to act under the color of state law.

**Second Claim for Relief -42 U.S.C. § 1983 – Eighth Amendment**

~~166.~~170.    Mr. Bryant re-alleges and incorporates herein all previously alleged paragraphs of the Complaint.

~~167.~~171.    The Eighth Amendment of the United States Constitution states that "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

~~168.~~172.    Prison officials may be held liable under the Eight Amendment if they know "that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."

~~169.~~173.    Defendant Annuci's counsel informed Mr. Bryant's counsel that DOCCS believed there was a substantial risk of serious medical harm if he was permitted to travel to the general population for even a few hours to visit the law library at Wende.

~~170.~~174.    Defendants Annucci and Koenigsmann authorized the transfer of Mr. Bryant to general population full-time, knowing that his risk of harm due to his medical conditions would significantly increase.

~~171.~~175.     Defendants Annucci and Koenigsmann have violated and continue to violate the Eighth Amendment rights of Mr. Bryant.

~~172.~~176.     Defendants Annucci and Koenigsmann, as New York State employees, were acting under the color of state law when they violated Mr. Bryant's Eighth Amendment rights and continue to act under the color of state law.

### Third Claim for Relief -42 U.S.C. § 12203– ADA

~~173.~~177.     Mr. Bryant re-alleges and incorporates herein all previously alleged paragraphs of the Complaint.

~~174.~~178.     42 U.S.C. § 12203 establishes that "no person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA]."

~~175.~~179.     Mr. Bryant made known via grievances and reasonable accommodation requests that he opposes the practice of not allowing RMU inmates to travel to the law library as it discriminates against individuals based on their disabilities.

~~176.~~180.     Subsequently, Mr. Bryant was transferred out of the RMU, which provided him with the supports and medical care he requires, to general population, which does not have the level of medical care he requires and was receiving in the RMU.

~~177.~~181.     Mr. Bryant had no medical or clinical change in his condition that would warrant a transfer to General Population.

~~178.~~182.     The transfer of Mr. Bryant by Defendant DOCCS is an act of illegal retaliation against Mr. Bryant for exercising his right to seek reasonable accommodation under the ADA. 42 U.S.C. § 12203.

**Fourth Claim for Relief – Section 504, 29 U.S.C. § 794**

~~179.~~183.	Plaintiff re-alleges and incorporates herein all previously alleged paragraphs of the Complaint.

~~180.~~184.	Section 504 provides that "no otherwise qualified individual with a disability in the United States…shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 29 U.S.C. § 794(a).

~~181.~~185.	Defendants receive federal financial assistance.

~~182.~~186.	Mr. Bryant made known via grievances and reasonable accommodation requests that he opposes the practice of not allowing RMU inmates to travel to the law library.

~~183.~~187.	Subsequently, Mr. Bryant was transferred out of the RMU, which provided him with the medical care he requires, to general population, which does not have the level of medical care he requires and was receiving in the RMU, and significantly increases the chances that Mr. Bryant will injure himself.

~~184.~~188.	The transfer of Mr. Bryant by DOCCS is an act of illegal retaliation under Section 504.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the following relief:

1. A declaratory judgment that Defendants have violated Plaintiff's rights under the First Amendment.

2. A declaratory judgment that Defendants have violated Plaintiff's Eighth Amendment Rights.

3.  A declaratory judgment that Defendants have retaliated against Plaintiff in violation of 42 U.S.C. § 12203 and 29 U.S.C. § 794 by transferring Plaintiff to general population for engaging in protected actions;

4.  A preliminary and thereafter permanent injunction ordering Defendants transfer Plaintiff back to an RMU, and to keep him there as long as it remains medically necessary and his condition does not improve;

5.  An award of attorney's fees and costs; and

6.  Such other and further relief as the Court deems just and proper.

DATED:    February 27, 2018

          Albany, New York

Respectfully submitted,

DISABILITY RIGHTS NEW YORK
Attorneys for Plaintiff

MEGAN WILLIAMS

JESSICA BARLOW

SIMEON GOLDMAN

725 Broadway, Suite 450
Albany, New York 12207
(518) 432-7861 (telephone)
(518) 427-6561 (fax) (not for service)